| UNITED STATES DISTRICT COURT | SOUTHERN DISTRICT OF TEXAS |
|---|---|

ST. LUKE'S EPISCOPAL HEALTH SYSTEM    §
CORPORATION, *et al.,*                §
                                      §
          Plaintiffs,              §
                                      §
*versus*                              §    CIVIL ACTION H-03-5534
                                      §
FACTORY MUTUAL INSURANCE              §
COMPANY,                              §
                                      §
          Defendant.               §

## Opinion on Condition Clause

1. *Introduction.*

A hospital's basement flooded during a storm causing damage to its electrical system. Its insurance company funded repairs to restore power and fix the electrical system. The hospital cannot prove that the repairs did not restore the equipment to pre-loss condition. The insurance company does not have to replace the repaired equipment with new equipment.

2. *Background.*

St. Luke's Episcopal Hospital bought coverage from Factory Mutual Insurance Company for property damage and business interruption. In June 2001, tropical storm Allison struck Houston, flooding St. Luke's basement. It lost power from damage to its electrical switchgear, consisting primarily of normal and emergency power distribution centers.

Immediately after the damage the hospital's electrical contractor, Fisk Electric, began repairing and replacing the equipment. The hospital sent the damaged distributors to Electrical Controller Products, a factory-authorized GE repair contractor, to be rebuilt. All the distributor transformers were replaced.

Within ten days, the initial repairs were completed, and the hospital promptly re-

opened after passing an inspection by the Texas Department of Health.  Fisk continued to work on the equipment for approximately sixteen months.

On November 26, 2001, Linbeck Construction, St. Luke's general contractor for the flood repairs, sent a letter to the hospital's public adjusters, St. Luke's policyholder representatives.  Summarizing its current and estimated costs, Fisk reported $5,937,288.26 as the projected total amount to complete both its "Temporary" and "Permanent" repairs.  That letter was subsequently altered at the hospital's request by changing all references to "permanent" work to "temporary" based on St. Luke's interpretation that a UL label was required by the code.

By October, 2002, both St. Luke's and Factory admitted that the hospital's contractors had restored the basement to "pre-flood condition" at a cost of approximately $6 million. Fisk's costs were paid by Factory after the hospital submitted a $95,630,993 proof of loss, of which Factory agreed to pay $60,599,897.

The hospital now seeks money to replace the repaired equipment with new equipment because the repairs did not restore it to its pre-loss condition.  Its opinion is based on an affidavit by Steve Reed, vice president of Electrical Power Systems, who was hired in 2001 by the hospital to evaluate the repaired equipment.  Relying on putative testing discrepancies in the repaired transformers, circuit breakers and air switches, Reed attempts to show that the repairs failed to restore the hospital to substantially the same condition as before the flood.

Factory moved for summary judgment because it says it satisfied its obligation by placing the equipment in its pre-loss condition.

3.      *The Condition Clause*.

In the event of a physical loss, the policy requires Factory to pay for the cost to repair the property to pre-loss condition.  To prevail, the hospital must show that the repairs did not restore the equipment to substantially its pre-loss condition.  That it cannot do.

*A. Transformers.*

Based on Reed's declaration, the hospital contends that the transformers were not restored. He argues that, in violation of National Electrical Code 110.3, four of the transformers lack nameplates while others remain identified by their original nameplates. Contrary to Reed's declaration, that section does not require a nameplate, and the mere absence of a nameplate does not suggest – much less – establish that the transformers were not restored to *substantially* the same condition. Nor does the absence of a nameplate indicate that they should be replaced in their entirety.

The hospital also argues that because it knows little about the replacement transformers, they cannot be as reliable as the originals or have an equal life expectancy. The average useful life of a transformer of this type is twenty to thirty years. The hospital's transformers, however, had been in operation for more than thirty years, having already exceeded their normal life expectancy before the flood. The replacements, moreover, were supplied and tested before installation by the hospital's own contractors, including GE and Controller. If anything, the hospital is now equipped with transformers that will last longer than the originals.

Last, Reed attempts to show that four of the transformers are not suitable for continuous permanent service under industry standards. He relies on standards promulgated by NETA – the International Electrical Testing Association, an accredited standards developer for the American National Standards Institute – even though there is no mandated or generally accepted standard. In fact, NETA cautions that conformity to its standards is completely voluntary and does not preclude the use of non-conforming equipment.

Controller, furthermore, tested and passed each replacement transformer before being placed into service. Because the transformers passed the tests performed by the hospital's own factory-authorized GE repair contractor, it is irrelevant whether they complied with industry standards. The hospital cannot have its agents test and accept its equipment and then later reject it. This rule is expressed in the maxim that one who acts through another acts for itself. *Wright v. Calhoun*, 19 Tex. 412, 422 (1857).

   B. *Circuit Breakers and Air Switches.*

Reed notes that insulation values of three circuit breakers now do not meet industry standards, while before the flood they did. The breakers were refurbished in 1996 by Controller who used its own standards. This same GE-authorized service company did the post-flood repairs and tested the breakers under the same standards. Again, the breakers tested satisfactorily, meeting industry standards.

The hospital also says that none of the insulating barriers for its air switches was replaced. The air switches, however, including the insulation, were also tested by Controller, and it reported satisfactory test results.

4. *Conclusion.*

The damaged equipment was manufactured in 1967 and was in operation since at least 1970, with numerous modifications. The repaired electrical equipment has performed reliably for over five years since the flood. The equipment was selected, purchased, refurbished, tested and installed – all by the hospital's contractors. The equipment passed the contractor's tests, and Reed's opinion is based on review of these tests.

Assertions must be supported by facts to be sufficient to oppose a motion for summary judgment. *Williams v. Weber Mgmnt. Serv.*, 839 F.2d 1039, 1041 (5th Cir. 1987). Reed's declaration does not raise a factual issue about the equipment's having been restored to substantially the same condition as before the flood. Glaringly, Reed did not conduct a pre-flood inspection or have a scientific basis for knowing its condition. His hypothetical evaluation, years after the fact, cannot show that the equipment was not restored to its pre-flood conditions.

Signed on April 24, 2007, at Houston, Texas.

Lynn N. Hughes
United States District Judge